# UNITED STATES DISTRICT COURT
## DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br><br>    vs.<br><br><br>SHEARN JOSHUA,<br><br>        Defendant. | No. 3:21-cr-00037-JMK-DMS<br><br>**REPORT AND RECOMMENDATION**[1] **TO GRANT THE DEFENSE'S MOTION TO SUPPRESS [Dkt. 53]** |

## I.  INTRODUCTION

Defendant Shearn Joshua moves to suppress evidence obtained as result of the search of his person and his vehicle, asserting that both his detention and the seizure and search of his vehicle were impermissible (Dkt. 53). The government responded in opposition, arguing (1) that Joshua's detention was permissible as incident to the execution of a search warrant, (2) that law enforcement had probable cause to arrest Joshua for possession of marijuana, and (3) that the positive K-9 drug alert during the stop provided probable cause to search Joshua's vehicle (Dkt. 55). On June 28, 2021, an evidentiary hearing was held on this matter (Dkt. 68).

The motion is now ripe for consideration by the Court. For the following reasons, the Court recommends that the District Court **GRANT** the motion to suppress.

//

---

[1] This report and recommendation is being issued as a final report and recommendation. Pursuant to Fed. R. Crim. P. 59(b)(3), any objections will be considered by the District Court Judge who will accept, reject, or modify the recommendation, or resubmit the matter to the Magistrate Judge for additional consideration and recommendations.

Case 3:21-cr-00037-JMK-MMS  Document 74  Filed 08/09/21  Page 1 of 22

## II.  STATEMENT OF FACTS

In February 2021, law enforcement was conducting an ongoing investigation of Joshua's co-defendant, Miguel Pineiro (Dkt. 68 at 13). As part of that investigation, law enforcement performed continuous surveillance on Pineiro's residence (Dkt. 68 at 13-14). During the surveillance, officers observed a maroon Porsche parked outside the residence for an extended period of time (Dkt. 68 at 15). Sometime before February 18, 2021, law enforcement ran the plates of the Porsche and learned it was registered to Joshua (Dkt. 68 at 15). Photos of Joshua were disseminated to the surveillance team (Dkt. 68 at 33, 54).

### A.  Joshua is Observed Driving to the Tree House

On February 18, 2021 at approximately 1:00 PM, law enforcement observed a man leave Pineiro's residence, get into the Porsche, and drive away (Dkt. 68 at 17, 69). Law enforcement followed the Porsche to the "Tree House," a store which sells marijuana (Dkt. 68 at 17). When the man got out of the Porsche at the Tree House, officers identified him as Joshua (Dkt. 68 at 17-18). Law enforcement observed Joshua walk into the Tree House (Dkt. 68 at 17). Police did not observe Joshua while he was inside; they did not see him purchase anything nor did they observe him carrying anything back to his car (Dkt. 68 at 44). Law enforcement knew the Tree House sold marijuana but the officers did not know whether they sold other items that are not controlled substances under Federal law (Dkt. 68 at 44). Joshua then returned to the Porsche and drove back to the residence (Dkt. 68 at 17).

### B.  Pineiro is Arrested

Later that day, law enforcement observed a white Toyota Rav 4 arrive at the residence; it was driven by a female (Dkt. 60-1 at 8). Pineiro exited the residence and entered the Toyota

(Dkt. 60-1 at 8). After following the Toyota for some distance, law enforcement pulled it over for a traffic violation at approximately 4:15 PM (Dkt. 60-1 at 9, 21).

During the stop, a K-9 unit performed at drug sniff of the Toyota (Dkt. 60-1- at 9). The K-9 alerted to the presence of controlled substances (Dkt. 60-1 at 10). Other than the "several seconds that transpired . . . before [Pineiro] was taken out of the vehicle," the occupants of the Toyota did not have any opportunity to reach out to Joshua and inform him of the traffic stop (Dkt. 60-1 at 26). Pineiro was detained in the back of a law enforcement vehicle (Dkt. 60-1 at 10).

Law enforcement informed Pineiro of the positive alert and asked for permission to retrieve the drugs; Pineiro told law enforcement that he put the drugs inside a backpack on the floorboard of the Toyota (Dkt. 60-1 at 11). Inside the backpack was approximately one pound of methamphetamine (Dkt. 60-1 at 11). Pineiro and the female driver were transported to DEA's district office and law enforcement started the application for a search warrant of Pineiro's residence (Dkt. 60-1 at 12).

### C. Joshua is Detained at the Gas Station

At approximately 7:40 PM, several hours after Pineiro was arrested and law enforcement began the process of applying for a warrant to search the residence, law enforcement observed Joshua leave the residence for a second time that day (Dkt. 68 at 76; Dkt. 60-1 at 13). Officers observed Joshua walk to the Porsche and get inside; after that Joshua "moves it from its parking spot, backs it up to the door or small walkway on the front of the residence. Gets out of the vehicle and retrieves a couple of bags, small tote, and puts it in the vehicle, and then departs" (Dkt. 68 at 76).

Law enforcement followed Joshua to a gas station about a quarter mile from the residence (Dkt. 68 at 61-62, 92). At this time, law enforcement had identified the man as Joshua and knew of his criminal history, which included prior drug convictions as well as a conviction for negligent homicide (Dkt. 68 at 81). The officers were directed to stop the Porsche if Joshua left the residence (Dkt. 68 at 80-81).

The Porsche was parked next to a gas pump when police pulled into the gas station, (Def. Ex. B at 1:00). Joshua sat in the driver's seat (Dkt. 68 at 94). To initiate the stop, an unmarked law enforcement vehicle pulled in front of the Porsche and a marked law enforcement vehicle pulled in behind with its lights flashing (Def. Ex. B at 0:57). A plainclothes officer exited the unmarked vehicle with his weapon drawn (Def. Ex. B at 1:00). Joshua was ordered to step out of the Porsche (Def. Ex. B at 1:10). Additional uniformed officers surrounded the Porsche with their weapons drawn (Def. Ex. B at 1:20). Joshua exited the Porsche (Def. Ex. B at 1:32).

Joshua walked backwards and out of the view of the officer's dash cam, but the audio reveals that Joshua was subjected to a pat search (Def. Ex. B at 1:40). Joshua's pockets were emptied and the officer placed the contents on the hood of a police car (Def. Ex. B at 4:33; Dkt. 68 at 86). An officer then stated on his radio, "I have the driver. I will be back to the office here in a minute" (Def. Ex. B at 5:45). Joshua's personal effects were then placed into a paper bag and carried off (Def. Ex. B at 6:14). At some point, Joshua was handcuffed (Dkt. 68 at 63). Next, Joshua was informed that a K-9 unit would perform a drug sniff of his vehicle and Joshua was told, "You're going to come back with me to the DEA office" (Def. Ex. B at 7:07).

During this time, law enforcement performed a safety sweep of the vehicle. The front passenger door of the Porsche was opened, followed by the right rear passenger door (Def. Ex. B

at 3:11). After briefly looking inside the Porsche, officers shut the rear passenger door (Def. Ex. B at 3:30). The officers left the front passenger door open (Def. Ex. B at 3:30). Law enforcement opened the rear door of the Porsche again and briefly looked around, and then closed the door (Def. Ex. B at 3:50). An officer again looked inside the open front passenger door and the door was left open (Def. Ex. B at 4:03).

A K-9 unit arrived on scene (Def. Ex. B at 7:15). Officer Catherine Scott, the K-9 unit handler, testified that when she got on scene, she was told that law enforcement had "probable cause to use the dog" (Dkt. 68 at 106).[2] The K-9 immediately approached the open passenger door of the Porsche; the K-9 put her front paws inside the Porsche and extended the front half of her body into the car (Def. Ex. B at 7:15). Officer Scott then used her arm to direct the K-9 to sniff along the exterior of the right side of the vehicle, toward the rear (Def. Ex. B at 7:29).

When Officer Scott neared the open passenger door for a second time, she extended her arm inside the Porsche and the K-9 followed, putting her paws into the vehicle and again extending the upper half of her body into the Porsche (Def. Ex. B. at 7:35). The K-9 then sat down, indicating an alert for controlled substances (Def. Ex. B at 7:45; Dkt. 68 at 100).

Next, Officer Scott directed the K-9 to sniff the front of the Porsche, followed by the left side, and then the rear (Def. Ex. B at 7:49). The K-9 stopped at the rear of the Porsche and sniffed for 33 seconds, jumping up on the bumper (Def. Ex. B at 8:07). Officer Scott describes this as an aggressive indication for the scent of controlled substances (Dkt. 68 at 103). The K-9

---

[2] Officer Maria Boothroyd testified that the officers believed they had probable cause to arrest Joshua because "[h]e was departing a residence that we suspected was going to contain further evidence of narcotics trafficking" (Dkt. 60-1 at 22); Officer Dale Boothroyd testified that the officers "had probable cause to believe that evidence was being removed from the house" and that "[t]he visit to the marijuana store" also provided probable cause for Joshua's arrest (Dkt. 68 at 24).

unit was trained to detect only methamphetamine, heroin, and cocaine, not marijuana (Dkt. 68 at 24; 97).

After the K-9 drug sniff was concluded, an officer got into the Porsche and drove it to the DEA office (Def. Ex. B at 9:17; Dkt. 68 at 23, 34). At that time Joshua was transported to the DEA office, as well (Dkt. 68 at 23). Once at the DEA office, the interior of the Porsche was searched (Dkt. 68 at 34). No search warrant was obtained (Dkt. 68 at 23-24). Inside the Porsche, officers found approximately 4.5 pounds of methamphetamine, a loaded firearm, and $12,000 in cash (Dkt. 55 at 3).

## III.  APPLICABLE LAW

### A.  Detention of Individuals During the Execution of a Search Warrant

Detention of "the occupants of the premises while a proper search is conducted . . . is allowed without probable cause to arrest for a crime." *Bailey v. United States*, 568 U.S. 186, 193 (2013) (citing *Michigan v. Summers*, 452 U.S. 691, 705 (1981)). "Once an individual has left the immediate vicinity of a premises to be searched, however, detentions must be justified by some other rationale." *Id.* at 202. A stop farther than a mile away from a residence subject to a search warrant is not considered within the immediate vicinity. *Id.* at 201.

> [C]ourts can consider a number of factors to determine whether an occupant was detained within the immediate vicinity of the premises to be searched, including the lawful limits of the premises, whether the occupant was within the line of sight of his dwelling, the ease of reentry from the occupant's location, and other relevant factors.

*Id.* at 201.

//

//

## B. Warrantless Arrest by DEA Agents

A DEA agent has the power to "make arrests without warrant (A) for any offense against the United States committed in his presence, or (B) for any felony, cognizable under the laws of the United States, if he has probable cause to believe that the person to be arrested has committed or is committing a felony." 21 U.S.C. § 878(a)(3).

"Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v. Lopez,* 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Beck v. State of Ohio,* 379 U.S. 89, 91 (1964)).

> Although "[p]robable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction," *Adams v. Williams,* 407 U.S. 143, 149, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), we have held that "when specific intent is a required element of the offense, the arresting officer must have probable cause for that element in order to reasonably believe that a crime has occurred."

*Rodis v. City, Cty. of San Francisco*, 558 F.3d 964, 969 (9th Cir. 2009) (citing *Gasho v. United States,* 39 F.3d 1420, 1428 (9th Cir. 1994).

## C. The Permissible Scope of a *Terry* Stop

Police may detain or seize an individual for brief, investigatory purposes if the officer has reasonable suspicion of criminal activity, a lesser standard than probable cause. *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968). "Because it is a 'less demanding' standard, 'reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause.'" *Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020) (citing *Alabama v. White*, 496 U.S. 325, 330 (1990)).

However, law enforcement cannot exceed the scope of a *Terry* stop without probable cause. *United States v. Edwards*, 761 F.3d 977, 981 (9th Cir. 2014).

> The totality of the circumstances determines whether and when an investigatory stop becomes an arrest. In looking at the totality of the circumstances, we examine two main components of the detention. First is the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the plaintiff's liberty was restricted. Under this component, we review the situation from the perspective of the person seized, assessing whether a reasonable innocent person in these circumstances would have felt free to leave after brief questioning. Second is the justification for the use of such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken. This inquiry is undertaken from the perspective of law enforcement, while bearing in mind that the purpose of a *Terry* stop is to allow the officer to pursue his investigation without fear of violence. The second inquiry frequently proves determinative.

*Id.* (internal citations omitted).

### 1. Protective Searches During a *Terry* Stop

"[I]n the context of a roadside encounter, where police have reasonable suspicion based on specific and articulable facts to believe that a driver may be armed and dangerous, they may conduct a protective search for weapons not only of the driver's person but also of the passenger compartment of the automobile" *Minnesota v. Dickerson*, 508 U.S. 366, 374 (1993). If an officer "lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified." *Id.* at 375–76. However, "[i]f the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Id.* at 376.

//

### 2. Moving a suspect during a *Terry* stop

[P]olice may move a suspect without exceeding the bounds of the *Terry*-stop when it is necessary for safety or security reasons, when it is the least intrusive method available to achieve the legitimate goals of the stop, and when moving the suspect does not make the circumstances of the detention so coercive that the detention becomes indistinguishable from an arrest.

*United States v. Baron*, 860 F.2d 911, 915–16 (9th Cir. 1988) (internal citations removed). "Unlike a transport to the police station, a *Terry*-stop is not transformed into a de facto arrest when a defendant is moved from the street to the back of a police car." *United States v. Rodriguez*, 471 F. Supp. 3d 1049, 1075 (D. Idaho 2020), *reconsideration denied*, No. 1:19-CR-00133-DCN, 2020 WL 4353555 (D. Idaho July 29, 2020) (citing *Baron*, 860 F.2d at 915 ("While officers here had reasonable suspicion—independent from the illegal search—to stop [the defendant] and to remove him to the back of [the] police car while they ran a canine around his vehicle, they lacked probable cause to take him to the police station until they searched his vehicle after obtaining the positive canine alert")).

### 3. The use of a K-9 Unit during a *Terry* stop

During a *Terry* stop, a K-9 sniff of a vehicle's exterior does not itself constitute a search which implicates Fourth Amendment concerns. *Illinois v. Caballes*, 543 U.S. 405, 409 (2005). In *Caballes*, the Supreme Court noted that "the dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation. Any intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement." *Id.*

However, a K-9 sniff of the interior of a vehicle during a *Terry* stop can amount to an unlawful search. *United States v. Winningham*, 140 F.3d 1328, 1330-31 (10th Cir. 1998). The Tenth Circuit found "the Fourth Amendment was not implicated when a trained drug dog leapt into the open hatchback door of a suspect's car during a valid *Terry* stop because the dog's action was 'instinctive,'" however, when "the officers themselves opened the door" and the K-9 handler demonstrated a "desire to *facilitate* a dog sniff of the van's interior," the interior sniff during a *Terry* stop was unlawful. *Id.* (emphasis in original); *see also United States v. Curry*, 478 F. App'x 42, 44 (4th Cir. 2012) (holding that a "dog's subsequent intrusion into the car's passenger compartment" was permissible because it occurred *after* an exterior alert, at which point officers had the requisite probable cause to perform a sniff of the car's interior).

### D.  The Exclusionary Rule Bars Evidence Obtained Because of an Unlawful Search or Seizure.

"The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion." *Wong Sun v. United States*, 371 U.S. 471, 485 (1963). "This rule—the exclusionary rule—encompasses evidence directly 'seized during an unlawful search' as well as '[e]vidence derivative of a Fourth Amendment violation—the so-called 'fruit of the poisonous tree.'" *United States v. Garcia*, 974 F.3d 1071, 1075 (9th Cir. 2020) (quoting *United States v. Gorman*, 859 F.3d 706, 716 (9th Cir. 2017)). "The 'fruit of the poisonous tree' doctrine does not require a particularly tight causal chain between the illegal search and the discovery of the evidence sought to be suppressed." *United States v. Ngumezi*, 980 F.3d 1285, 1291 (9th Cir. 2020).

"The focus is on the causal connection between the illegality and the evidence; and, **the burden of showing admissibility rests on the prosecution**." *United States v. Johns*, 891 F.2d

243, 245 (9th Cir. 1989) (emphasis added) (citing *United States v. Chamberlin*, 644 F.2d 1262, 1269 (9th Cir. 1980). In *Ngumezi*, the Ninth Circuit found that an illegal search occurred when following a traffic stop, the officer opened the passenger door and leaned inside. 980 F.3d at 1291. The vehicle was later towed when the defendant could not produce a valid driver's license. *Id*. at 1287. During a standard inventory search before towing the vehicle, law enforcement discovered an illegal handgun. *Id*. Because the government failed to adequately plead a lack of causal connection between the officer's illegal search and the later inventory search, the Ninth Circuit reversed the lower court's ruling that the gun was admissible at trial, stating that "[i]t is the government's burden to show inevitable discovery" or other exceptions to the exclusionary rule, "so its failure to make the argument prevents us from upholding the denial of the suppression motion on that theory." 980 F.3d at 1291.

## IV.  DISCUSSION

### A.  Summary

First, Joshua's detention was not justified as a detention incident to search warrant, since Joshua had left the immediate vicinity of the Pineiro's residence before he was detained. Next, Joshua's detention was not justified as a warrantless arrest, because the officers lacked probable cause to believe that Joshua committed the offense of marijuana possession or removal of property to be seized. While the officers had reasonable suspicion that Joshua was removing evidence sufficient to justify a *Terry* stop, the officers exceeded the scope of the *Terry* stop when non-contraband items were removed from Joshua's pockets and an officer told him he was being taken back to the DEA office. Further, the K-9 unit's interior search of the Porsche was impermissible in the context of a *Terry* stop because the officers opened the passenger door, left

Case 3:21-cr-00037-JMK-MMS   Document 74   Filed 08/09/21   Page 11 of 22

it open, and Officer Scott directed the K-9 unit to search inside the vehicle without probable cause. Therefore, the officers performed an illegal search and seizure of Joshua's person and an illegal search of the Porsche.

The government has not met its burden to demonstrate that any evidence found during the subsequent search of the Porsche's interior at the DEA office was not "fruit of the poisonous tree" stemming from the illegal search and seizure of Joshua's person or the illegal search of the Porsche. Therefore, any evidence found on Joshua's person and inside the Porsche is subject to suppression.

## B. Joshua's Detention Was Not Justified as Incident to the Execution of a Search Warrant.

The search warrant had not been issued at the time of Joshua's detention. While police are justified in detaining individuals on premises subject to a search warrant, that allowance does not apply once those individuals leave the immediate vicinity. *Bailey*, 568 U.S. at 202. In *Bailey*, the Supreme Court found that the detention incident to search warrant exception did not apply when prior to the initiation of the search, law enforcement watched two men leave the residence-to-be-searched in a vehicle and followed them for about a mile before pulling the vehicle over. *Id*. at 190. The Supreme Court determined that the distance in that case, approximately a mile, was outside "the immediate vicinity" of the residence. *Id.* at 201. The Court stated that closer calls could be determined by assessing "whether the occupant was within the line of sight of the dwelling, the ease of reentry from the occupant's location, and other relevant factors" surrounding the stop. *Id*.

Here, Joshua was detained at the gas station approximately a quarter mile from the residence. Though this is closer than the stop in *Bailey*, analysis of the *Bailey* factors

demonstrates that Joshua was no longer within the immediate vicinity of the residence at the time of his detention. The gas station is not within the lawful limits of the residence, nor is it within the line of sight; to get from the residence to the gas station required "a few turns," making quick reentry of the residence difficult (Dkt. 68 at 92). Joshua's detention therefore cannot be justified as incident to a warrant search of Pineiro's residence.

The government asks the court to make this determination using a balancing test to find Joshua's detention was reasonable based on the following factors:

> You have a person, Mr. Pineiro [Joshua's co-defendant], who's been taken into custody with a large amount of narcotics. You have significant delay. You have the agents seeing this other person who has been convicted of prior narcotics trafficking, whose vehicle has been in the area over the period of surveillance . . . suggesting a significant association, removing exactly the kinds of objects that could be used to conceal the relevant evidence and leaving the scene.

(Dkt. 68 at 126-27). These factors amount to reasonable suspicion sufficient to justify a *Terry* stop. However, as a *Terry* stop, the detention of Joshua was subject to limitations; mainly, that the officers' conduct could not amount to a Fourth Amendment search or seizure absent probable cause.

### C. The DEA Officers Lacked Probable Cause to Arrest Joshua at the Time of the Stop.

The government argues that officers had probable cause sufficient to arrest Joshua for crimes relating to marijuana possession, or alternatively, for crimes related to removal of property to prevent its lawful seizure. However, at the time of Joshua's detention at the gas station officers lacked probable cause that Joshua had committed either violation.

#### 1. Officers lacked probable cause to believe Joshua was in possession of marijuana.

The government asserts that observing Joshua enter a store that sells marijuana and return to his vehicle is sufficient to justify Joshua's arrest (Dkt. 55 at 3-4). Under the DEA arrest

statute, the officers needed to witness Joshua committing the crime of misdemeanor marijuana possession or the officers needed probable cause to believe that Joshua committed a felony crime related to marijuana possession. *See* 21 U.S.C. § 878(a)(3). The Fourth Amendment also requires probable cause to justify such arrest. *Lopez*, 482 F.3d at 1072.

Under federal law, marijuana is a Schedule I controlled substance. 21 C.F.R. § 1308.11(d)(23). Further, because Joshua had a prior conviction for a drug related offense, possession of marijuana by Joshua would amount to a felony. 21 U.S.C. § 844(a). The government asserts that the officers "personally saw him committing this crime" and that "[t]he agents also had probable cause to believe that he was in fact Shearn Joshua, and that Shearn Joshua was a person for whom, due to his prior record, such possession was a felony" (Dkt. 55 at 4).

However, the officers did not observe Joshua while he was inside the store nor did they witness Joshua carrying anything as he left (Dkt. 68 at 44). Further, the officers could not state whether the store sold other items that are not controlled substances (Dkt. 68 at 44). Instead, the government cites Joshua's Motion to Suppress, filed on April 27, 2021, where Joshua states he bought marijuana (Dkt. 55 at 2, citing Dkt. 53 at 6). This later concession cannot be used retroactively to bolster the officers' probable cause to believe that Joshua actually came into possession of marijuana on February 18, 2021.[3]

---

[3] Officers testified that the marijuana offense was not the subjective reason for Joshua's detention (Dkt. 68 at 40-44, 107). However, whether probable cause exists to justify a search or seizure is not determined based on an officer's subjective intent, instead a search or seizure is lawful if the facts known to the officer at that time amount to probable cause to believe a crime was committed. *Davenpeck v. Alford*, 543 U.S. 146, 153 (2004). Here, there was not enough information known to the officers at the time of Joshua's detention to provide probable cause to believe he had been in possession of marijuana. *Davenpeck* makes clear that a probable cause determination is limited to the facts known to the officers at the time of the search or seizure. *Id*. at 153-55.

The officers did not witness Joshua commit the crime of marijuana possession nor did they have probable cause to believe that Joshua actually purchased anything from the store, let alone a controlled substance. Therefore, Joshua's detention cannot be justified as an arrest for the possession of marijuana.

## 2. Officers lacked probable cause to believe Joshua was removing property for the purpose of preventing its lawful seizure.

Officers Maria Boothroyd and Dale Boothroyd both testified that at the time of the detention, they thought they had probable cause to believe Joshua was removing evidence (Dkt. 60-1 at 22; Dkt. 68 at 24). Officer Scott testified that when she arrived on scene, she was told there was probable cause to search the Porsche for such evidence (Dkt. 68 at 106).

It is illegal to remove property to prevent its seizure; 18 U.S.C. § 2232 provides that:

> [w]hoever, before, during, or after any search for or seizure of property by any person authorized to make such search or seizure, **knowingly** destroys, damages, wastes, disposes of, transfers, or otherwise takes any action, or **knowingly** attempts to destroy, damage, waste, dispose of, transfer, or otherwise take any action, for the purpose of preventing or impairing the Government's lawful authority to take such property into its custody or control or to continue holding such property under its lawful custody and control, shall be fined under this title or imprisoned not more than 5 years, or both.

18 U.S.C. § 2232(a) (emphasis added). Under §2232, "[a]n actor is liable only if he removes or destroys the property with the purpose of preventing seizure. An essential element of § 2232 is that the defendant have the 'specific intent' to prevent the seizure of the goods." *Gasho v. United States*, 39 F.3d 1420, 1430 (9th Cir. 1994) (internal citations omitted).

Here, the officers lacked probable cause to believe that Joshua knew of the impending search warrant for Pineiro's residence and therefore was transporting items for the purpose of preventing its later seizure. While the officers testified that they knew of Joshua's prior drug convictions, Officer Maria Boothroyd testified that on February 18, 2021 officers "didn't know Mr. Joshua was part of [the] investigation" (Dkt. 60-1 at 19). The officers lacked probable cause to believe that Joshua was part of a conspiracy to distribute drugs with Pineiro.

When Pineiro was stopped earlier that day, both he and the other passenger in the Toyota were taken straight to DEA headquarters. While officers testified that there were a few seconds between when the police initiated the traffic stop and when Pineiro was detained in which Joshua could have been notified of the stop, there was no indication that Pineiro or the other passenger contacted Joshua to inform him that the police might come and search the residence (Dkt. 60-1 at 12). Instead, the government asserts that because it had been almost four hours since Pineiro left the residence and had not returned, the officers had probable cause to believe Joshua was aware of the impending search warrant.[4] As mentioned *supra*, "[w]hen specific intent is a required element of the offense, the arresting officer must have probable cause for that element." *Rodis*, 558 F.3d at 969. This four-hour gap is not sufficient to establish probable cause that Joshua knew that police arrested Pineiro and were in the process of obtaining a search warrant. Therefore, the officers lacked probable cause to believe Joshua was removing evidence with the specific intent to avoid its seizure.

//

//

---

[4] The traffic stop of Pineiro was at approximately 4:15 PM and Joshua was detained at approximately 8:15 PM (Dkt. 60-1 at 21).

**D. Joshua's Initial Detention Was Justified as a *Terry* Stop, But the Officers' Conduct Exceeded the Scope of a *Terry* Stop and it Became an Unlawful Arrest.**

The officers' initial show of force did not convert the *Terry* stop into an arrest, as it was justified by the officers' legitimate safety concerns. However, the officers' conduct in removing and seizing Joshua's non-contraband personal effects and notifying Joshua of their decision to take him into custody amounted to an unlawful arrest.

Whether the scope of a *Terry* stop is exceeded is determined by the totality of the circumstances; where officers' actions are justified by their safety concerns, those boundaries have not been exceeded. *Edwards*, 761 F.3d at 981. Here, officers surrounded the Porsche, drew their weapons, and ordered Joshua to step out with his hands up and slowly walk backwards toward an officer. The officer then pat searched Joshua, handcuffed him, and he was placed in the back of a police vehicle. All of this could be justified by officers' concern that Joshua had weapons and posed a safety threat. At the time of the *Terry* stop, police were aware of Joshua's identity and criminal history, a criminal history which included prior drug crimes and criminally negligent homicide (Dkt. 68 at 58, 95). In *Buffington*, the court found that officers were justified when the suspects were "forced from their car and made to lie down on wet pavement at gunpoint" because the police had reason to believe that one of the occupants had previously been charged with killing a police officer and the police suspected weapons were inside the vehicle. 815 F.2d 1292, 1300 (9th Cir. 1987); *see also United States v. Jacobs,* 715 F.2d 1343, 1346 (9th Cir. 1983) ("The radio dispatch informed [the officer] that the bank robber was possibly armed and under the influence of PCP, and [the officer] was alone at the time. These circumstances justified the actions of [the officer] in ordering defendant and her passenger to 'prone out' at gunpoint as a protective measure while he continued his investigation"). As in *Buffington* and

*Jacobs*, the officers here had a legitimate concern that Joshua could have a weapon and might use it, therefore they were justified in ordering him out of the car and placing him in handcuffs.

However, all items were removed from Joshua's pockets and placed them on the hood of a police car.[5] The items appear to be a set of keys, a wallet, and a cellphone. The items were then put into a paper bag and taken elsewhere. Further, an officer stated on the radio that he intended to take Joshua to DEA headquarters "in a minute" and Joshua was told that his vehicle would be subject to a K-9 unit drug detection search and that he would be going to the DEA office (Def. Ex. B at 6:14, 7:07). All of this occurred before the K-9 unit began its drug sniff. In *Campa*, the court found that similar conduct was impermissible during a *Terry* stop, stating that:

> [t]he officer who frisked appellant . . . made no attempt to distinguish between bulging items that could be weapons and other types of concealed objects, reaching into appellant's pockets whenever he felt a protrusion and emptying all items onto the floor. If this indiscriminate removal of items embraced objects that were readily identifiable by touch as *non*-weapons, then the further invasion of appellant's privacy occasioned by removing them from his pockets was unnecessary and thus unlawful. . . .

*United States v. Campa*, 234 F.3d 733, 739 (1st Cir. 2000) (emphasis in original); *see also*

*United States v. Teague*, No. 2:10-CR-006-RWS-SSC, 2010 WL 6529640, at *15 (N.D. Ga. Nov. 12, 2010), *report and recommendation adopted*, No. 2:10-CR-00006-RWS, 2011 WL 1497876 (N.D. Ga. Apr. 19, 2011) (Listing cases where removal of non-contraband items from a defendant's person exceeded the scope of a *Terry* stop). While the officers in this case might have been justified in searching Joshua for weapons, they were not justified in removing and

---

[5] In the motion to suppress, the defense states that the items in Joshua's pockets were not removed until after the K-9 unit alerted on the Porsche and Joshua was taken to the DEA office (Dkt. 53 at 7), however, the dash cam video of the stop shows that the items were removed before the K-9 unit began its search of the Porsche (Def. Ex. B at 6:14).

seizing all items from Joshua's pockets regardless of whether they appeared to be weapons or other contraband. The actions of the officers exceeded the scope of a *Terry* stop.

Additionally, transporting a suspect to a police station is far more intrusive than detaining the suspect on scene and courts have found that such conduct does not usually fit the "least intrusive method available to achieve the legitimate goals" of a *Terry* stop. *See Baron*, 860 F.2d at 915–16. While Joshua was not transported to DEA headquarter until after the K-9 unit's positive alerts, it is clear that the officers had made the decision to transport Joshua prior to the K-9 search, as the officer made statements to Joshua and other law enforcement that Joshua would be taken to DEA headquarters. In the totality of the circumstances analysis, the intrusiveness of the stop is determined from the defendant's point of view and is weighed against the justification for such tactics from law enforcement's point of view. *Id.* Here, the stop was exceedingly intrusive when the officers made it clear to Joshua that he would be taken to the DEA office and from the officers' perspective there was no safety justification for moving Joshua. Joshua was handcuffed and detained in the back of a police car at the time and therefore posed little threat to the officers.

The *Terry* stop therefore became an unlawful arrest when the officers seized non-contraband items from Joshua's pockets and informed him of their decision to take him to DEA headquarters absent probable cause to believe Joshua had committed a crime.

### E. The K-9 Unit Search Exceeded the Permissible Scope of an Exterior Vehicle Search During a *Terry* Stop.

While a K-9 unit search of a vehicle's exterior is permissible during a *Terry* stop, a search of the vehicle's interior is far more intrusive. *Illinois v. Caballes*, 543 U.S. at 409. In determining whether a K-9 interior search was unlawful, courts look to whether the doors to the

vehicle were opened by the defendant or by the officers and whether the officers directed the dog to search inside the vehicle or whether the dog did so of his own volition. *Winningham*, 140 F.3d at 1330-31. Here, the officers opened the passenger door of the Porsche. Further, they did so after Joshua was detained, so Joshua had no opportunity to shut the door before the search was performed. Also, at one point Officer Scott extended her arm inside the Porsche, directing the K-9 to sniff inside. Following her arm, K-9 put her paws inside the door of the Porsche and extended the upper half of her body into the vehicle. The K-9 then alerted to the scent of controlled substances. The search exceeded the scope of a *Terry* stop and amounted to an illegal search.

It is important to note that when Officer Scott arrived on scene, she was told that law enforcement had probable cause to believe that there were controlled substances inside the Porsche. As mentioned *supra*, law enforcement did not have probable cause at that time. If law enforcement had probable cause, the search of the Porsche's interior would have been permissible. This might explain why the officers left the passenger door open and Officer Scott directed the K-9 inside the vehicle. However, regardless of the officers' mistaken assertions, the search was unlawful.

## F. Due to the Unlawful Arrest and Search, Suppression of Evidence Found on Joshua's Person and in the Porsche is Appropriate.

The exclusionary rule prevents evidence from being presented at trial "in the prosecution's case in chief or otherwise as substantial evidence of guilt" when such evidence derived from an illegal search or seizure. *United States v. Leon*, 468 U.S. 897, 910 (1984). To avoid suppression, the government bears the burden of demonstrating a lack of a "causal connection between the illegality and the evidence." *Johns*, 891 F.2d at 245. In *Ngumezi*, the

Ninth Circuit noted that the government's failure to assert such lack of causal connection failure "prevents us from upholding the denial of the suppression motion on that theory." *Id.* at 1291.

### 1. Causal connection between unlawful arrest and the K-9 search

There is a causal connection between the unlawful arrest and the K-9 search. Shortly after the *Terry* stop was unlawfully exceeded, the officers who seized the items from Joshua's person and broadcasted their decision to take Joshua to the DEA office notified Officer Scott that probable cause to search the Porsche been established and she initiated a K-9 search. The government failed to assert otherwise; in its briefing to the Court and during the evidentiary hearing, the government was silent as to whether the officers would have found the evidence inside the Porsche regardless of whether the officers exceeded the scope of the *Terry* stop.

### 2. Causal connection between the interior and exterior K-9 searches

At the evidentiary hearing, the government asserted that there was a lack of causal connection between the illegal interior K-9 sniff and the evidence later found inside, because the K-9 subsequently alerted to the exterior of the Porsche, explaining:

> [i]t is about 180 degrees around, basically the furthest part of the car from the front passenger point. It seems to me like a pretty fairly independent event . . . there's not that causal connection that would be required for fruit of the poisonous tree. It's not – I mean the testimony isn't that Officer Scott saw that alert and decided, oh, well, I should go to the back corner then, and would have something differently. It would have just stopped there if the dog hadn't gone inside or had gone inside or hadn't altered, whatever it might be. It seems to me like a completely independent event.

(Dkt. 68 at 135).[6] This assertion fails to meet the government's burden to demonstrate that the exterior alert less than 30 seconds after the K-9 illegally entered and alerted to the

---

[6] The government provided this theory to the Court for the first time at the end of the evidentiary hearing after the witnesses had already testified.

vehicle's interior was in no way connected to that initial illegal search. The government offered

no evidence that the K-9 nor Officer Scott were not influenced by the first alert. When the Court

asked the government whether after an alert, the dog could have "the smell in their nostrils" and

therefore could be more likely to alert again, the government offered no evidence to answer the

question (Dkt. 68 at 134-35). No expert testimony was provided, and Officer Scott did not testify

about the issue.

The police statements to Officer Scott when she arrived on scene that there was probable

cause to believe that there were drugs inside the Porsche is also troublesome and it appears to be

the reason the front passenger door was left open by officers and why Officer Scott directed the

K-9 to enter the vehicle before the dog had alerted to the exterior.

The government has not met its burden to demonstrate that the evidence found inside the

vehicle should not be suppressed as a result of either the illegal arrest or illegal search.

## V. <u>CONCLUSION</u>

For the foregoing reasons, the Court recommends that the District Court **GRANT** the

motion to suppress and prohibit the government from admitting for use at trial, in its case in chief

or as substantive evidence of guilt, following items: (1) any items seized from Joshua's person at

the time of his unlawful arrest on February 18, 2021 and (2) any items found inside the Porsche.

DATED this 9th day of August, 2021 at Anchorage, Alaska.

*/s/Deborah M. Smith*
CHIEF U.S. MAGISTRATE JUDGE